## A03A1486. JOHNSON v. THE STATE.
### (583 SE2d 489)

PHIPPS, Judge.

Carlre Demetric Johnson was charged with driving under the influence of alcohol to the extent that it is less safe to drive, driving under the influence of alcohol with an unlawful blood alcohol concentration of 0.08 grams or more, and certain speeding offenses. He was convicted on the less safe DUI charge. He appeals, contending that the trial court erred in overruling his objection to a question the prosecuting attorney asked a defense expert witness, in admitting the results of an Intoxilyzer breath test, and in instructing the jury on an inference that could be drawn from his blood alcohol concentration. Finding merit in the latter two contentions, we reverse.

The state's evidence showed that on July 27, 2001, City of Snellville police officer Signe Hall was on routine patrol when she stopped a car for speeding. Johnson was the driver, and there were two passengers. Upon speaking to Johnson, Hall noticed that his eyes were bloodshot and watery, and that a very strong odor of alcohol emanated from the vehicle. As a result, she asked him to step out of the car. Upon doing so, he began to sway and admitted that he had

[2] 215 Ga. App. 558 (451 SE2d 467) (1994).
[3] (Citations and punctuation omitted.) Id. at 561 (1) (a).

consumed two drinks containing alcohol within the prior forty-five minutes. At Hall's request, Johnson submitted to a series of field sobriety evaluations which he performed unsatisfactorily. As a result, Hall asked Johnson to breathe into an alco-sensor, which produced a positive result for the presence of alcohol.

Hall then arrested Johnson for DUI. Under Georgia's implied consent law, Hall informed Johnson that Georgia law required him to submit to state-administered chemical tests of his blood, breath, urine, or other bodily substances for the purpose of determining whether he was under the influence of alcohol or drugs and that, after first submitting to the required state test, he would be entitled to additional chemical tests at his own expense and from qualified personnel of his own choosing. When Hall then asked whether Johnson would submit to a state-administered breath test (in addition to the alco-sensor), he responded, "I'll take a urine test." Hall advised Johnson that she was asking him to submit to a breath test, and that, after submitting to the breath test, he could take whatever test he wanted. Hall then asked Johnson whether he would submit to the state-administered breath test, and he responded in the affirmative. While on the scene, Johnson later asked Hall, "When can I take my chemical test?" Hall responded that he would be taken to the jail for his test. Hall later transported Johnson to police headquarters, where an Intoxilyzer 5000 test was administered. The test showed that Johnson had a blood alcohol concentration of 0.081 grams. After arriving at headquarters, Johnson did not request an independent test and none was performed.

David Fries testified for the defense as an expert witness. Fries was a retired law enforcement officer from Florida. He had been responsible for inspection and maintenance of Florida's Intoxilyzer 5000 machines. He testified that, in his opinion, the acceptable deviation or margin of error for the Intoxilyzer 5000 is 0.02 grams, even though the manufacturer of the Intoxilyzer guarantees its accuracy to a plus or minus 0.003 blood alcohol concentration, and Georgia law enforcement officers are trained that the margin of error is 0.01. On cross-examination, he testified that Florida's legal limit had changed from 0.10 to 0.08 before his retirement and that, after the change, he had arrested people whose blood alcohol concentration registered 0.08 on the Intoxilyzer 5000. When the prosecutor asked whether Fries would ever charge a person with DUI when his or her blood alcohol level was 0.08 or higher, the defense objected. After the trial court overruled the objection, Fries explained that in Florida, the arresting officer did not decide whether to institute a DUI prosecution but that prosecutions were instituted "on .08 and above on arrests that I had made."

Johnson moved to suppress the results of the state-administered

breath test, arguing, among other things, that his request for an independent chemical test of his urine had been denied. At the hearing on the motion, Hall was asked whether she had interpreted Johnson's reference to a urine test as a request for an independent test. In response, Hall testified that she had assumed that he was not requesting an independent test because "I advised him that he could get that independently if he wished [and] [h]e never brought it up again after that." Johnson testified that he had wanted a urine test rather than a breath test because he had heard that the breath test was not as accurate, but he had never quite understood that he had to submit to the test selected by the officer (i.e., the breath test) before getting a urine test. The trial court denied the motion to suppress, ruling that Johnson had requested a state-administered urine test rather than an independent test.

1. Johnson first contends that the trial court erred in allowing the state to ask Fries whether he would charge persons with DUI if their blood alcohol concentration was similar to the defendant's. Relying on *Johnson v. Riverdale Anesthesia Assoc.*,[1] Johnson argues that the question was not relevant.

In *Johnson*, our Supreme Court concluded that because the standard of care in medical malpractice cases is that which is employed by the medical profession generally, and not what one individual physician would do under the same or similar circumstances, how a testifying medical expert personally would have treated a patient is not relevant to the issue of whether a physician committed malpractice and cannot be used to impeach the expert's credibility.

We find *Johnson* inapposite. In this case, the defense expert expressed his opinion that the Intoxilyzer 5000 machine has a margin of error of 0.02 grams. The testimony elicited from the expert on cross-examination showed that the state of Florida, for whom the expert had worked, prosecuted DUI cases based on the assumption that this machine has a margin of error significantly lower than 0.02. Because a jury could find that this impeached the witness's credibility, the trial court did not abuse its discretion in allowing the question on cross-examination.[2]

2. Johnson contends that the court erred in admitting the results of his breath test in evidence because he was denied his right to an independent chemical test.

OCGA § 40-6-392 (a) (3) provides that a person who is accused of DUI and who undergoes a chemical test at the request of a law enforcement officer has the right to have a

---

[1] 275 Ga. 240 (563 SE2d 431) (2002).

[2] See generally *Park v. State*, 220 Ga. App. 215, 218 (4) (469 SE2d 353) (1996).

qualified person of [his] own choosing administer an additional test. Law enforcement officers have a corresponding duty not to refuse or fail to allow an accused to exercise that right.[3]

"An accused's right to have an additional, independent chemical test or tests administered is invoked by some statement that reasonably could be construed, in light of the circumstances, to be an expression of a desire for such test."[4] " 'If an individual requests an independent test but is unable to obtain it, the results of the State-administered test cannot be used by the State as evidence against [him] unless the failure to obtain the test is justified.' "[5]

"OCGA § 40-5-67.1 places upon an arresting officer the duty to read to the accused the applicable implied consent notice as set forth therein."[6] The applicable notice in this case, as in *Ladow*, was the one for suspects age 21 or over. As found in OCGA § 40-5-67.1 (b) (2), it reads:

"Georgia law requires you to submit to state administered chemical tests of your blood, breath, urine, or other bodily substances for the purpose of determining if you are under the influence of alcohol or drugs. If you refuse this testing, your Georgia driver's license or privilege to drive on the highways of this state will be suspended for a minimum period of one year. Your refusal to submit to the required testing may be offered into evidence against you at trial. If you submit to testing and the results indicate an alcohol concentration of 0.08 grams or more, your Georgia driver's license or privilege to drive on the highways of this state may be suspended for a minimum period of one year. After first submitting to the required state tests, you are entitled to additional chemical tests of your blood, breath, urine, or other bodily substances at your own expense and from qualified personnel of your own choosing. Will you submit to the state administered chemical tests of your (designate which tests) under the implied consent law?"[7]

In *Ladow v. State*,[8] the defendant interrupted the officer after he had read the first sentence of the above warning. The defendant

---

[3] (Footnotes omitted.) *Ladow v. State*, 256 Ga. App. 726, 728 (569 SE2d 572) (2002).
[4] (Footnote omitted.) Id.
[5] (Footnote omitted.) Id.
[6] Id.
[7] (Emphasis omitted.)
[8] Id.

thereupon expressed her familiarity with the content of the warning and said, "I want a blood test." Without directly responding to the request, the officer read the remainder of the notice and then obtained the defendant's consent to submit to a state-administered blood test. Ladow did not again ask for an independent blood test, and at no point was one administered. As here, the state in *Ladow* argued that the officer reasonably construed the defendant's statement as referring to a certain type of state-administered test. We rejected that argument, reasoning as follows:

> [E]ach . . . notice [set forth in OCGA § 40-5-67.1] ends with the question, "Will you submit to the state administered chemical tests of your ((officer) designates which tests) under the implied consent law?" None, however, asks the accused whether [he] wants an additional, independent chemical test. And none specifies to the accused any requirements for requesting that test — linguistically, temporally, or otherwise. We do not believe that the legislature intended the notices to set up pitfalls for an accused who desires to have an additional, independent chemical test administered. We therefore cannot place upon an accused the burden of uttering words unspecified, yet more particularized than those uttered here: "I want a blood test."[9]

In response to the officer's implied consent warning in this case, Johnson expressed his preference to take a urine test rather than the state-administered breath test. Before being transported from the scene to take the breath test, he asked when he could take "my chemical test." Because these statements reasonably could be construed to be an expression of a desire for an independent urine test, we conclude that in this case, as in *Ladow*, the trial court erred in admitting the results of the state-administered test.

3. Johnson contends that the court erred in charging the jury that an inference that he was under the influence of alcohol could be drawn from a breath test result of 0.08 grams or more.

Specifically, the court charged the jury:

> If you should find from the evidence in this case that at the time of the alleged offense the amount of alcohol in the defendant's blood as shown by a chemical analysis of the defendant's blood or breath was .08 grams or more of alcohol, you may infer that the defendant was under the influ-

---

[9] (Footnotes omitted.) Id. at 728-729.

ence of alcohol. However, whether or not you make such an inference is a question for you to decide.

Although this charge was authorized by OCGA §§ 40-6-392 (c) (1) and 40-6-391 (a) (5),[10] and was approved in *Anderson v. State*,[11] it should not have been given in view of the inadmissibility of the evidence as to Johnson's blood alcohol concentration.

4. We find it highly probable that the improper admission of the results of the Intoxilyzer test along with the erroneous jury instruction contributed to the jury's determination that Johnson's alcohol consumption rendered him less safe to drive.[12]

*Judgment reversed. Blackburn, P. J., and Ellington, J., concur.*

DECIDED JUNE 12, 2003.

*William D. Healan III*, for appellant.
*Gerald N. Blaney, Jr., Solicitor-General, Wanda L. Vance, Assistant Solicitor-General*, for appellee.

---

[10] See *Diaz v. State*, 245 Ga. App. 380, 381 (1) (537 SE2d 784) (2000). OCGA § 40-6-392 (c) (1) provides:

> In any civil or criminal action or proceeding arising out of acts alleged to have been committed in violation of paragraph (5) of subsection (a) of Code Section 40-6-391, if there was at that time or within three hours after driving or being in actual physical control of a moving vehicle from alcohol consumed before such driving or being in actual physical control ended an alcohol concentration of 0.08 or more grams in the person's blood, breath, or urine, the person shall be in violation of paragraph (5) of subsection (a) of Code Section 40-6-391.

Under OCGA § 40-6-391 (a) (5), "[a] person shall not drive or be in actual physical control of any moving vehicle while . . . [t]he person's alcohol concentration is 0.08 grams or more at any time within three hours after such driving or being in actual physical control from alcohol consumed before such driving or being in actual physical control ended."

[11] 260 Ga. App. 606 (580 SE2d 249) (2003). Like the jury instruction approved in *Stepic v. State*, 226 Ga. App. 734, 735 (1) (487 SE2d 643) (1997), the charge in this case merely authorized the jury in its discretion to infer that the defendant was under the influence of alcohol and therefore was not unconstitutionally burden shifting. Unlike the charge given in *Baird v. State*, 260 Ga. App. 661 (580 SE2d 650) (2003), the charge in this case did not authorize the jury to infer that the influence of alcohol actually impaired the defendant's driving.

[12] See *Ladow*, supra at 730; *Kitchens v. State*, 258 Ga. App. 411, 415 (1) (574 SE2d 451) (2002); see also *King v. State*, 272 Ga. 788, 794 (2) (535 SE2d 492) (2000); but see *Parker v. State*, 259 Ga. App. 236 (576 SE2d 610) (2003); *Camp v. State*, 259 Ga. App. 228, 230 (2) (576 SE2d 610) (2003); *Walsh v. State*, 220 Ga. App. 514 (2) (469 SE2d 526) (1996); *Jones v. State*, 200 Ga. App. 666 (2) (409 SE2d 251) (1991).